# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA ex rel.   )  CASE NO.:  1:14 CV 1808
J. LYNN ROYCROFT                 )
8811 Township Road 34         )
Galion, OH 44833-9083         )
                            )  JUDGE OLIVER
        Relator,        )
v.                         )  MAGISTRATE JUDGE BAUGHMAN
                            )
The Geo Group, Inc., a Florida corporation  )  FIRST AMENDED COMPLAINT FOR
c/o Statutory Agent            )  VIOLATION OF THE FEDERAL FALSE
Corporate Creations Network, Inc.    )  CLAIMS ACT [31 U.S.C. Section 3729 et seq.]
119 E. Court Street           )  AND FOR MONEY DAMAGES
Cincinnati, OH  45202        )
                            )
       and          )  JURY TRIAL DEMANDED
                            )
Correct Care, LLC,          )
a Florida limited liability company    )
c/o Registered Agent          )
Corporate Creations Network, Inc.    )
11380 Prosperity Farms Road #221E  )
Palm Beach Gardens, FL  33410    )
                            )
       and          )
                            )
Cornell Companies, LLC,      )
a Delaware limited liability company  )
c/o Registered Agent          )
Corporate Creations Network, Inc.    )
3411 Silverside Road #1104, Rodney Bldg. )
Wilmington, DE  19810        )
                            )
       and          )
                            )
Cornell Corrections Management, LLC,  )
a Delaware limited liability company  )
c/o Registered Agent         )
Corporate Creations Network, Inc.    )
3411 Silverside Road #1104, Rodney Bldg. )
Wilmington, DE  19810        )
                            )
       and          )
                            )

Cornell Abraxas Group, Inc.,                )
a Delaware corporation                      )
c/o Statutory Agent                         )
Corporate Creations Network, Inc.           )
119 E. Court Street                         )
Cincinnati, OH 45202                        )
                                            )
            Defendants.

For her complaint against defendants The Geo Group, Inc., Cornell Companies, Inc., and Cornell Abraxas Group, Inc. (collectively "Defendants"), relator Lynn Roycroft ("Roycroft or Relator") states as follows:

## COMPLAINT

### I.      Introduction

1.      This lawsuit is based on a scheme by the Defendants to defraud the United States by knowingly submitting false fraudulent charges for payment under the Medicaid program. These acts constitute violations of the federal False Claims Act, 31 U.S.C. §3729 et seq. ("FCA").

2.      Relator, Roycroft, on behalf of and in the name of the United States of America sues to recover treble damages and civil penalties arising from the submission of false Medicaid claims by Defendants Geo Group, Inc., Correct Care, LLC, Cornell Companies, LLC, Cornell Corrections Management, LLC, and Cornell Abraxas Group, Inc.  Relator brings this civil action under the qui-tam provisions of the False Claims Act.

3.      Relator is the original source of these allegations within the meaning of the False Claims Act.

4.      Relator provided the government with a confidential disclosure statement and documents substantiating the allegations in this case prior to the filing of this action under seal in 2014.

5.      The documents provided by Relator included information regarding the emails, progress notes and claims described below.

6.      This action is not based on public disclosure of information within the meaning of 31 U.S.C. §3730(e)(4)(A).   The relator has direct and independent knowledge, within the meaning of 31 U.S.C. §3730(e)(4)(B), derived through her interactions with Abraxas Ohio.

## II.      Jurisdiction and Venue

7.      This court has jurisdiction over this Complaint under 31 U.S.C.  § 3732(a) and 28 U.S.C. § 1331 and § 1345.

8.      Venue in the Northern District of Ohio, Eastern Division is proper under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a) because the Defendants transact business within this District, and the acts proscribed by the FCA occurred within the District.

## III.     Parties and Other Entities

9.      Relator Roycroft, is a citizen and resident of the United States, a former employee of Defendants.

10.     Cornell Companies, Inc. was a Delaware corporation headquartered in Houston, Texas prior to its merger into defendant The Geo Group, Inc. in 2010, and was converted into a Delaware limited liability company, Defendant Cornell Companies, LLC ("Cornell Companies") in 2013.  Cornell Corrections Management, Inc. was a Delaware corporation and a wholly owned subsidiary of Cornell Companies, which was converted into a Delaware limited liability company, Cornell Correction Management, LLC ("Cornell Management") in 2013.   Cornell Abraxas, Inc. ("Cornell Abraxas") is a Delaware corporation, which is a wholly owned subsidiary of Cornell Management.

11.     In 2008 and 2009, James E. Hyman was President and CEO, and John R. Neiser was Vice-President and CFO, for each of the above-described Cornell entities, Cornell Companies, Cornell Management and Cornell Abraxas.  Jonathan P. Swatsburg was employed by Cornell Companies as Senior Vice-President for its Abraxas Youth and Family Services division ("Abraxas").  Swatsburg was responsible for the development, management and regulatory compliance of the Cornell Companies' Abraxas division facilities including a residential treatment facility located at 2775 State Route 39 in Shelby, Ohio ("Abraxas Ohio").

12.     The Abraxas Ohio facility is certified or accredited by the Ohio Department of Alcohol and Drug Addiction Services (ODADAS), primarily for adjudicated delinquent and/or dependent males under the age of 21, with substance use/abuse issues, behavioral problems and/or sexual abusive behavior.

13.     Relator, Roycroft, was employed by the above described Cornell entities as a Clinical Supervisor at the Abraxas Ohio residential treatment facility.  Roycroft worked as a first floor supervisor at Abraxas Ohio on May 28, 2008 and left her employment on March 6, 2009 because of her concerns regarding the operation of the treatment facility.

14.     In 2010, Cornell Companies merged into The Geo Group, Inc., a Florida corporation headquartered in Boca Raton, Florida.  The Geo Group, Inc. is licensed to do business in the State of Ohio as a foreign corporation.

15.     After the merger, Cornell Companies, Cornell Management and Cornell Abraxas were subsidiaries of The Geo Group, Inc.  The Geo Group, Inc.'s wholly owned subsidiary, GEO Care, Inc., which was converted into Geo Care, LLC in 2012 and renamed as Correct Care, LLC ("Correct Care"), operates a youth services division, which includes the Ohio Abraxas facility. Swatsburg served as Divisional Vice-President of Correct Care's Youth Services Division.  He

4

was responsible for the development, management and regulatory compliance of its facilities, including the Ohio Abraxas facility.

16.     In 2014 the Geo Group, Inc. (Doc. No. M75246) merged into the Geo Group REIT, Inc. (Doc. No. P13000058433).  The Geo Group REIT, Inc. was then renamed the Geo Group, Inc. ("Geo Group")

### IV.     History of the Federal False Claims Act

17.     The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained because of fraud against it.

18.     The Act was amended in 1986 because Congress found that fraud in federal programs was pervasive and that the Act, which Congress has characterized as the primary tool for combating fraud against the federal Government, was in need of modernization.  Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

19.     Likewise, the 2009 and 2010 amendments were introduced to fill gaps in the coverage of the Act and to correct ambiguities in the drafting and misinterpretations of the intended scope of the Act that had emerged in case law in the more than 20 years that had passed since the 1986 amendments.

20.     From the 1986 amendments until May 20, 2009, the FCA prohibited, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent

claim for payment or approval" as well as (b) "knowingly mak[ing] us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729 (a)(1)-(2) (1986).

21.     Until May 20, 2009, "claim" was defined under the Act as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c) (1986).

22.     As amended in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Act now imposes liability upon any person who, *inter alia*:  (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval" or, effective June 7, 2008, (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729 (a)(1)(A)-(B) (2009).

23.     As amended by FERA on May 20, 2009, "claim" now is defined in the Act as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A) (2009).

24.     Pursuant to the 2009 FERA amendments, a violation of the FCA occurs when any person ". . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (2009).

25.     The term "obligation" is defined under the Act to include:  "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3) (2009).

26.     Any person who violates the Act is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim, plus three times the damages sustained by the United States.

27.     The Act allows any person having information about false or fraudulent claims to sue for himself and the United States, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

28.     Based on the foregoing federal FCA provisions, *qui tam* Relator seeks, through this action, to recover damages and civil penalties arising from the Defendants' knowing fraud against the Medicaid program.

## V.     The Medicaid Program

### A.     Applicable Federal Law

29.     The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. §1396, et seq., is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.  The federal Medicaid statute

7

establishes the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. §1396a.

30.    The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain minimum criteria for coverage and payment of claims.  42 U.S.C. §§1396, 1396a.

31.    Medicaid was created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program.  Under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.   Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.   The agency must create and implement a "plan for medical assistance" consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").   After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan.  42 U.S.C. § 1396b(a)(1).  This reimbursement is called "federal financial participation" ("FFP").

32.    Federal financial participation in Medicaid spending by each state is calculated each fiscal year under a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to over 75% in FFP, depending on many factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures needed or expected.

8

33.    Ohio's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(1)(A), 42 U.S.C. § 1396d(a)(1)-(2), and uses a cost reporting method similar to that used under Medicare.

34.    Each provider who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.  Ohio requires the prospective Medicaid provider to agree that he/she will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions.  A provider who violates these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

**B.    Applicable State Law**

35.    Abraxas Ohio is licensed as a Children's Residential Center by the Ohio Department of Job and Family Services (ODJFS).    ODJFS oversees the state's Medicaid program.

36.    Defendants' officers, managers, and employees knew that the treatment of Medicaid youth for substance use/abuse at Abraxas Ohio was governed by regulations promulgated by ODADAS.  O.R.C. § 3793.06.

37.    The state minimum requirements for certification of an alcohol and drug addiction services residential treatment program are set forth in O.A.C. §3793:2-5-01.  This section provides that residential treatment programs must provide:

(C) (1). Structured alcohol/drug addiction services and activities for at least thirty hours for adults and twenty hours for adolescents per seven day week.
(2). Individual and/or group counseling services shall be provided at least five days per week….
(E)  Time for meals, unstructured activities, "free time," time spent in attendance of self help groups, such as alcoholics anonymous or narcotics anonymous, is not included in the minimum hours of services and activities for a residential treatment program.
(F) Interpersonal and group living skills shall be promoted in residential and halfway house treatment programs.  Clients shall be transitioned to the general community

for education, job training, job interviews, employment stabilization and obtaining alternative living arrangements.

    (1) A program may require clients to perform tasks of a housekeeping nature without compensation as specified within program guidelines.

    (2) Housekeeping tasks shall not be considered as meeting the alcohol/drug addiction services and activities requirement.

(G)  Each residential … treatment program shall be organized and clinically managed to provide non-medical community residential level of care…. It is a planned program of professionally-directed evaluation, care and treatment for the restoration of functioning for persons with alcohol and other drug problems and/or addiction….

(J)  Each residential and halfway house treatment program shall provide, at a minimum, the following alcohol and drug addiction services at the program site in accordance with rule 3793:2-1-08 of the Administrative Code:

    (1) Assessment services,

    (2) Individual and group counseling services,

    (3) Crisis intervention services, and

    (4) Case management.

38.    Assessment services, as provided in O.A.C. §3793:2-1-08(K), "means the evaluation of an individual to determine the nature and extent of his/her abuse, misuse and/or addiction to alcohol and/or other drugs.  Assessment services shall consist of time limited, structured, face-to-face sessions."  Further, assessments must include information related to eighteen categories in O.A.C. §3793:2-1-08(K)(3).

39.    Individual counseling, as provided in O.A.C. §3793:2-1-08(N), "involves a face-to-face encounter between a client or client and family member and a counselor. Individual counseling means the utilization of special skills to assist an individual in achieving treatment objectives through the exploration of alcohol and other drug problems and/or addiction and their ramifications, including an examination of attitudes and feelings, consideration of alternative solutions and decision making and/or discussing didactic materials with regard to alcohol and other drug related problems."

40.    Group counseling, as provided in O.A.C. §3793:2-1-08(O), "means the utilization of special skills to assist two or more individuals in achieving treatment objectives. This occurs

through the exploration of alcohol and other drug problems and/or addiction and their ramifications, including an examination of attitudes and feelings, consideration of alternative solutions and decision making and/or discussing information related to alcohol and other drug related problems…. Group counseling shall be documented per paragraphs (M) and (N) of rule 3793:2-1-06 of the Administrative Code.  Group sessions, which focus on helping individuals increase awareness and knowledge of the nature, extent and harm of their alcohol and drug addiction … shall be documented per paragraph (O)(1) of rule 3793:2-1-06 of the Administrative Code … [and] shall not eliminate the requirement for group counseling in outpatient and residential treatment."

41.     "Crisis intervention service is a face-to-face interaction with a client that is in response to a crisis or emergency situation experienced by themselves, a family member and/or significant other.  It begins with an evaluation of what happened during the crisis and the individual's response or responses to it .... Information about the individual's strengths, coping skills, and social support networks is also obtained."  O.A.C. §3793:2-1-08(L).

42.     "Case management services means those activities provided to assist and support individuals in gaining access to needed medical, social, educational and other services essential to meeting basic human needs."  O.A.C. §3793:2-1-08(M).  The regulation also provides that transportation and waiting with clients for appointments does not constitute case management.

43.     These treatment services must be documented by written progress notes.  O.A.C. §3793:2-1-06 provides:

> (O) Progress notes shall be written to reflect the implementation and evaluation of ITPs for clients admitted to programs. Progress notes are required to include sufficient content to justify the client's continuing need for services. Each service listed in rule 3793:2-1-08 of the Administrative Code delivered to the client, with the exception of urinalysis, shall be documented as defined is this rule in the client's record with either a service level, daily or weekly progress note….

11

(1) Progress notes shall indicate progress the client is making towards achieving the goals and objectives that are identified in the individualized treatment plan.

(P) Service level progress notes shall include, at a minimum, the following:

(1) Client identification (name and/or identification number).

(2) Date of service contact or service delivery.

(3) Length of time of service contact or service delivery (calculated by the number of hours, minutes and/or start and ending time of service delivery).

(4) Type of service (for example, case management, individual counseling, group counseling, crisis intervention, etc.).

(5) Summary of what occurred during the service contact or service delivery.

(6) Date, original signature and credentials (registration, certification and/or license) of the staff member providing the service.

(R) Daily or weekly progress notes shall include, at a minimum, the following and may include checklists:

(1) Client identification (name and/or identification number;

(2) For daily progress notes, the calendar day the progress note is applicable to;

(3) For weekly progress notes, the weekly period the progress note is applicable to. (must be a continuous 7 day period);

(4) An overall summary of the client's treatment progress during the note period.

(5) Date, original signature and credential (registration, certification and/or license) of the staff member writing the daily or weekly progress note. The staff member must be qualified, in accordance with rule 3793:2-1-08 of the Administrative Code, to provide all of the services documented in the daily or weekly service log.

(S) Client records utilizing daily or weekly progress notes pursuant to paragraph (P) of this rule must contain a service log that includes, at a minimum, the following which may include checklists:

(1) Date of service for each service provided during the day or week.

(2) Type of services (for example, case management, individual counseling, group counseling, crisis intervention, etc.) provided during the day or week.

(3) Length of time of each service contact or service delivery (calculated by the number of hours, minutes and/or start and ending time of each service delivery.

(4) The signature and license of each clinician who provided services during the day or week.

44.    The Ohio Chemical Dependency Professionals Board establishes and administers the process for licensure or certification of chemical dependency counselors and assistants. O.R.C. §4758.24; O.A.C. §4758:4-01.

45.     Chemical dependency counselor assistants (CDCA) must complete a formal application process with the Board and at a minimum must have forty hours of approved training every two years.   R.C. §4758.43; O.A.C. §4758:4-01.

46.     To be certified as a CDCA, the forty hours of approved training, under O.A.C. §4758:5-01(A) must cover the following content areas:

> (1) Addiction knowledge (five hours)
> (2) Treatment knowledge (nine hours)
> (3) Professionalism (six hours)
> (4) Evaluation (three hours)
> (5) Service coordination (four hours)
> (6) Documentation (three hours)
> (7) Counseling
> (a) Individual (five hours)
> (b) Group (five hours)

## VI.     Violations of the False Claims Act- False Records or Statements

### A.     Summary

47.     Beginning on some unknown date before May 28, 2008, continuing through March 6, 2009, and continuing through some unknown date thereafter, Defendants through their managers, and employees, knowingly presented, or caused to be presented, to ODJFS, false or fraudulent claims for payment of expenses related to the drug and alcohol treatment of delinquent and/or dependent male youths at the Abraxas Ohio residential treatment facility.

48.     These claims were false or fraudulent in at least one or more of the following ways:

> a. Defendants falsely and fraudulently represented that structured alcohol/drug addiction services and activities were provided for at least twenty hours per week; O.A.C. § 3793:2-5-01(C)(1).
>
> b. Defendants failed to provide evening services and activities;

13

c.  Defendants fraudulently included time for meals, unstructured activities, and "free time," in the minimum required hours of addiction services and activities; O.A.C. §3793:2-5-01(E).

d.  Defendants fraudulently included time for housekeeping tasks in the minimum required hours of addiction services and activities; O.A.C. §3793:2-5-01(F) (2).

e.  Defendants falsely and fraudulently documented group counseling; O.A.C. §3793:2-1-06.

1.  Defendants provided inaccurate information regarding the length of service provided;

2.  Defendants provided inaccurate information regarding the service provided;

3.  Defendants provided inaccurate information regarding the staff providing the service;

4.  Defendants permitted staff to use prewritten "cut and paste" notes, notes not timely written, and notes signed by persons not providing the service; O.A.C. §3793:2-1-06.

5.  Defendants falsely and fraudulently required missing progress notes to be completed. O.A.C. §3793:2-1-06.

f.  Defendants falsely and fraudulently represented the qualifications and training of CDCA personnel. O.A.C. §4758:4-01 and O.A.C. §4758:5-01.

**B.    Allegation Regarding Defendants' Unlawful Conduct**

49.    Relator Lynn Roycroft is a licensed professional clinical counselor.

50.    The Abraxas Ohio residential treatment facility has three floors.  Roycroft served as clinical supervisor for counseling services provided on the first floor for approximately 30-35

14

adolescent males.  The other two floors also had approximately 30-35 adolescent males and a clinical supervisor for counseling services provided to them.  The three clinical supervisors reported to a clinical director.

51.     The counseling services provided by Defendants at Abraxas Ohio included services by chemical dependency counselor assistants ("CDCAs").  However, the training required for certification of the CDCAs at the Abraxas Ohio facility was not provided.

52.     At the beginning of her employment at Abraxas Ohio, Roycroft attended the training sessions for new employees hired to serve as CDCAs.

53.     One of the sessions, which was represented as providing three hours of training for purposes of fulfilling the forty hours of training required for certification as a CDCA, was a session on dual diagnosis.  This session, attended by Roycroft, lasted only 15 minutes.

54.     Another session of training required for CDCA certification, attended by Roycroft, was a session on suicide.  This session was represented as providing 1-2 hours of the required training, but it lasted only 30 minutes.

55.     The CDCAs on the first floor of the Abraxas Ohio facility were placed under Roycroft's supervision.  Roycroft observed that they did not have adequate skills to provide the counseling services that were being provided at the Abraxas Ohio facility.

56.     Defendants billed for three hours of clinical services for each adolescent each work day.  The services were divided into four categories:  morning group for one hour, moral inventory for one-half hour, evening group for one hour and closure group for one-half hour.

57.     These services were billed as group counseling services, as defined above.  CDCAs may only perform group counseling services related to abuse of or dependency on

alcohol and other drugs under supervision of certain professionals, including licensed professional clinical counselors, such as Roycroft. OAC 3793:2-1-08 (KK)

58.     The group counseling services were generally bundled and billed as one item for each adolescent for each day.

59.     Roycroft reviewed the progress notes prepared by the CDCAs to document the group counseling and other services they provided, to ensure they met requirements. After she signed off on the progress notes, they were submitted to Abraxas Ohio's billing department, which prepared and submitted bills to Ohio's Medicaid program for the documented services.

60.     In the first few months of her employment, Roycroft experienced significant difficulties in getting the CDCAs under her supervision to properly document services. She corrected and counseled the CDCAs regarding the documentation requirements. However, the problems with improper documentation continued.

61.     Roycroft observed that progress notes were often identical, vague and lacked sufficient detail, and occasionally would reflect the wrong name of a client. She also observed that on numerous occasions, two counselors at the same session would report different start and finish times. She learned that the counselors had a bank of standard progress notes that they would exchange with each other for 'cut and paste' use in preparing progress notes.

62.     Bruce Tessena, Abraxas Ohio's director, insisted on full billing of three hours a day per client for counseling. Rebecca Mascazine, from Abraxas Ohio's billing department, would send memos to the clinical supervisors if they did not sign off on progress notes for such services. She would request that progress notes, if not provided, be prepared weeks and even months after the days for which no progress notes were provided.

63.     Roycroft instructed the CDCAs under her supervision that it was improper to prepare progress notes for previous days if they did not have contemporaneous notes or an independent recollection of the required information.

64.     In January 2009, Roycroft refused to sign off on certain progress notes for a variety of reasons.  She received numerous emails and memos requesting completion of the progress notes in the next few months.  Roycroft reported to Todd Fry, the clinical director, that signing off on or preparing the progress notes under the circumstances would not be proper.  On January 30, 2009, Fry reported this to Tessena explaining that signing off on or creating progress notes months after the fact was improper under the circumstances.

65.     Nonetheless, Abraxas Ohio officials continued to insist that the progress notes be signed off on or prepared long after the services had purportedly been provided.

66.     During the course of her employment at Abraxas Ohio, Roycroft learned that group counseling sessions were being used as snack time, for conducting housekeeping chores, for disciplinary control, watching TV and other non-therapeutic activities.

67.     In February 2009, Roycroft learned that counseling services provided in the evening group were not being regularly conducted or were not being conducted for the full time being billed.

68.     In February 2009, Roycroft learned from one of the chemical dependency counselors that the closure group was not being conducted, and had not been historically conducted, because there was no time in the schedule.  Despite this fact, progress notes were prepared reflecting the provision of these services, which were then being billed to Medicaid. Roycroft confirmed this with other employees at Abraxas Ohio and resigned her employment shortly thereafter.

### C.      False Claims

69.      Beginning on some unknown date before May 28, 2008, continuing through March 6, 2009, and continuing through some unknown date thereafter, Defendants have submitted numerous claims on Forms UB-92 and/or UB-04 to the Medicaid program overseen by ODJFS for reimbursement for services related to the drug and alcohol treatment of delinquent and/or dependent male youths at the Abraxas Ohio residential treatment facility.

70.      These claims were false and fraudulent because Defendants had not provided all the treatment services, for which they were seeking reimbursement.

71.      These claims were false and fraudulent because they used payment codes corresponding to specific counseling services whereby Defendants represented that they had provided specific types of treatment.  The claims also used identification numbers corresponding to a specific residential treatment program.  By conveying this information without disclosing Defendants' many violations of basic treatment services, staff and licensing requirements for alcohol and drug addiction programs, Defendants' claims constituted misrepresentations.

72.      Representative examples of the false claims submitted by Defendants include:

a.      A claim submitted to Medicaid for counseling services provided by Rebecca A. Wagers, CDCA, to client C. R.  (000001056) on September 20, 2008.

b.      A claim submitted to Medicaid for counseling services provided by Todd M. Wells, CDCA, to client A. R. (000001084) on September 20, 2008.

c.      A claim submitted to Medicaid for counseling services provided by Andrew D. Lerback, CDCA, to client D. M. (000001138) on September 20, 2008.

d.      A claim submitted to Medicaid for counseling services provided by Rebecca A. Wagers, CDCA, to client K. C. (000001087) on September 20, 2008.

e.      A claim submitted to Medicaid for counseling services provided by Andrew D. Lerback, CDCA, to client L. F. (000001100) on September 20, 2008.

f.      A claim submitted to Medicaid for counseling services provided by Rebecca A. Wagers, CDCA, to client D. M. (000001110) on September 20, 2008.

g.      A claim submitted to Medicaid for counseling services provided by Rebecca A. Wagers, CDCA, to client C. R. (000001056) on September 20, 2008.

h.      A claim submitted to Medicaid for counseling services provided by Andrew D. Lerback, CDCA, to client J. W.  (000001083) on September 20, 2008.

i.      A claim submitted to Medicaid for counseling services provided by Rebecca A. Wagers, CDCA, to client K. C. (000001087) on September 20, 2008.

j.      A claim submitted to Medicaid for counseling services provided by Andrew D. Lerback, CDCA, to client L. F. (000001100) on September 20, 2008.

73.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for Defendants' illegal conduct.

74.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

75.     The United States is entitled to the maximum penalty of up to $11,000 for every violation alleged.

**D.      Knowingly**

76.     "Knowing" and "knowingly" under the FCA, means that a person (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the

information, or (3) acts in reckless disregard of the truth or falsity of the information. Proof of a specific intent to defraud is not required. 31 U.S.C. §3729(b).

77. Defendants' actions, with respect to the presentation of the subject claims as described above, were knowing, and Defendants had knowledge of the materiality of the above-described statutory, regulatory and contract requirements to the Government's decision to pay the subject claims, as shown by the following facts, among others:

a. The hour long evening group counseling session was frequently scheduled for 5:30 p.m. when dinner was at 6:00 p.m.

b. Roycroft attended a training session shortly after beginning her employment at Abraxas Ohio. The session was scheduled for 3 hours. The program lasted 15 minutes. Training provided at Abraxas Ohio for CDCA lacked substance and failed to fulfill the 40 hours required to qualify as a CDCA.

c. Defendants actions and discussions regarding the progress note issues described above as reflected in the following emails:

1. On January 23, 2009, Rebecca Mascazine sent out an email to Lynn Roycroft, Shannon Wolford and Judith Harley.

Subject "Tagging Notes"
Importance "High"
Hello Everyone,
I just entered all of November's TCRXI, TCINB and TINCO (Life Space Interviews) from the dates of 11/01/08-11/30/08. Can each of you please review these dates and finish tagging and signing what notes are still out there in the grid? There are other notes out there besides these. I would like to take at least the 1st – 15th of November over for billing by Monday. Please let me know when these are done…

2.      On January 26, 2009, Lynn Roycroft sent Rebecca Mascazine,

Shannon Wolford and Judith Harley a response to Mascazine's email.  Roycroft

copied Todd Fry, Interim Clinical Director.

I have all the notes tagged and signed in November I can.  There is a problem
with some notes being unacceptable because they are cut and paste, wrong topics,
Staff no longer here or woefully inadequate.  I have requested clarification from
Todd as to how to proceed. Lynn.

3.      On January 30, 2009, Todd Fry, Interim Clinical Director, sent

Bruce Tessena, Director of the Abraxas Ohio facility, and Erich Dumbeck an

email,  in response to Lynn Roycroft's email:

I'm forwarding this on to both of you because I don't know how you want to
proceed with this. The issues here include: It is fraudulent when staff write the
same note on every client (this was clearly stated as so by Tammy Tingle, an
Investigator for the State of Ohio Counselor, Social Worker, Marriage and Family
Therapist Board during an ethics workshop I attended in October).  It jeopardizes
Lynn's, Judie's, etc. license if they sign off on the same.
When staff are going back and writing a note for a group that occurred one month,
two months, etc. ago it is similarly problematic unless they took notes during
group and can show proof of this—otherwise, they're inventing information,
which is fraudulent documentation.
It is the same staff members –e.g.., Becca Wagers – who are repeat offenders in
these areas— I know that Lynn has kept good records of whom she's written
up because of documentation issues, if you   need to discuss this further with her.
I'm sure Shannon and Judie could provide a similar list.  In short, the same people
have been supervised around what's acceptable, and what's unacceptable,
documentation numerous times, yet continue to ignore what they've been asked to
do.  Todd  A. Fry, MSW, LISW-S, Interim Clinical Director.

4.      On February 4, 2009 Rebecca Mascazine sent out an email to Erich

Dumbeck; Derrick March and copied Lynn Roycroft and Inez Ferrante.

I just spoke to Lynn and we have confirmed again that these notes were
not touched over the weekend, which makes me believe that the other notes for
November were not touch either (the list that I gave you).  All the notes have the
client name "Roy" in the entire note and they are all the same from Dashawn's.
Becca's note is the same as another note in her group.
I don't mean to be such a pest but these notes are holding up
billing for        November 1- 15.

21

5.        On February 5, 2009 Jon Pasko sent Todd Fry and staff an email:

Subject: missing note list as of 2-5-09

Good job to everyone for not having any missing notes from yesterday. Please     keep working on getting these missing notes done, specially those over a month  old.

6.        On February 17, Bruce Tessena emailed Lynn Roycroft, James

Back Sr., Kyle Nickell and copied Thomas Standish and Erich Dumbeck.

It was brought to my attention that there has been some challenges ensuring the groups in the morning and evening start on time and run the entire scheduled time.  The team indicated that these issues could be addressed with some minor changes in the 1st floor schedule. The team also indicated that they will provide you with suggestions.

I would like a response on what your plan is to ensure that the groups start on time and run the entire scheduled time.  Your plan needs to include what changes you will be making and how you will monitor to ensure that the staff are following through.  Please provide me with a response before the start of CLM.

7.        On February 18, 2009, Jon Pasko emailed, Judith Harley, Lynn

Roycroft, Shannon Wolford copying Thomas Standish:

Subject: Tagging Notes

Once you guys are up to date on your tagging please stay one business day behind so that I am able to check missing notes.  This will help you guys out by allowing me to look for wrong duration times and activity codes.  There have been some issues with notes being tagged that are not correct.  If you have any question regarding this or any questions at all.  Please feel free to call Rebecca or I at any time.

8.        On February 20, 2009, Jon Pasko emailed Rebecca Mascazine,

copying Thomas Standish and Lynn Roycroft:

On the 18th of February there are 6 notes by John Patrick and 5 notes by Mike Bussert  for TAGRP's.   These notes are tagged with a client duration of 50.  If that is the actually duration then the activity needs to be changed to TSIOP along with the evening note changed to a TSIOP. If the duration is supposed to be one hour  (which the note infers).  Then the duration needs to be changed to 1.00 and the   activity left the same.

78.     Defendants' practices constituted a substantial failure to deliver the services to the residents for which it was paid by Medicaid.

## Count I

**False Claims Act**
**31 U.S.C. § 3729(a)(1) & (2) (1986)**
**31 U.S.C. § 3729(a)(1)(A) & (B) (2009)**

79.     Relator realleges and incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

80.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C.  3729, et seq. as amended.

81.     With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

82.     With respect to acts occurring on or after the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

83.     The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

84.     By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

85.    The United States is entitled to the maximum penalty of up to $11,000 for every violation alleged.

86.    By and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

## Count II

### False Claims Act
### 31 U.S.C. § 3729(a)(1)(G) (2009)

87.    Relator realleges and incorporates by reference the allegations in the paragraphs above as though fully set forth herein.

88.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

89.    By and through the acts described above, Defendants have knowingly and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the United States Government.

90.    The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

91.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

92.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

WHEREFORE, Relator prays for judgment against Defendants that:

1.    Defendants' cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.     This Court enter judgment against Defendants in an amount equal to three times the damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.     Relator be awarded all costs of this action, including attorneys' fees and expenses; and

4.     The United States and Relator recover such other and further relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Under Rule 38 of the Federal Rules of Civil Procedure, Relator demands a trial by jury.

Respectfully submitted,

*/s/ Warner Mendenhall*
Warner Mendenhall (#0070165)
190 North Union Street, Suite 201
Akron, OH 44304
Telephone:  (330) 535-9160
Fax:  (330) 762-9743
warnermendenhall@hotmail.com

*/s/ Thomas W. Connors*
Thomas W. Connors #0007226
Rod A. Moore #0093682
Black McCuskey
220 Market Avenue
Suite 1000
Canton, OH  44702
(330) 456-8341; fax (330) 456-5756
tconnors@bmsa.com
rmoore@bmsa.com

*Attorneys for Relator*

311054

25